UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ANTHONY PAGANELLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 2:19 CV 60 |
| | ) |
| RICHARD LOVELACE, | ) |
| | ) |
| Defendant. | ) |

## OPINION and ORDER

This matter is before the court on defendant's motion for partial summary judgment. (DE # 38.) For the reasons that follow, defendant's motion will be granted.

### I.     BACKGROUND

*A.     Parties' Agreement*

Defendant, and counter-claimant, Richard Lovelace began working as an estimator and project manager for Safe Environmental Corporation ("the Company") in 2006. (DE # 40-1 at 1.) He eventually became a vice president for the Company, managing operations, but was not involved in the financial side of the business. (*Id.* at 1, 4.) The Company is an asbestos and lead paint remediation company. (DE # 40-4 at 37.)

In early 2009, plaintiff Anthony Paganelli, the owner of the Company, approached Lovelace about buying the Company from Paganelli. (DE # 40-1 at 2.) Over the next six to nine months, Paganelli and Lovelace held a number of meetings amongst themselves and the Company's accountant. (*Id.*) The Company's accountant prepared a written Stock Purchase Agreement ("the Agreement"), and the Agreement was signed

on December 9, 2009. (*Id.* at 7.) Under the terms of the Agreement, Lovelace would purchase 100% of the Company's shares from Paganelli for: (1) a price of $3 million, to be paid in installments over a period of ten years; and (2) an annual salary to Paganelli of $150,000 while any portion of the $3 million remained unpaid. (*Id.* at 2.)

  B.  *Paganelli's Alleged Breaches of the Agreement*

Unbeknownst to Lovelace, during the approximately 12 months leading up to the close of the sale, Paganelli used as much as $484,606.79 in Company funds to pay for personal expenditures. (*Id.* at 3; DE # 40-2 at 2, 4.) For example, in April and June 2009, Paganelli signed Company checks totaling $11,628 to pay invoices for hardwood floor installation at a residence he owned. (DE # 40-2 at 6, 35-38; DE # 40-4 at 155-157.) Between October 2009 and December 2009, Paganelli signed Company checks totaling $37,295 to pay for landscaping and paver installation at that same residence. (DE # 40-2 at 2, 54-57; DE # 40-4 at 156, 162.) Furthermore, it is undisputed that, in March and June of 2009, Paganelli signed checks totaling $133,926.29 from the Company to pay his personal mortgage. (DE # 40-2 at 2, 74-78; DE # 40-4 at 169-170.)

Except for three payments on Paganelli's home loan, all of these transactions were recorded as Company business expenses. (DE # 40-2 at 3; DE # 40-3 at 3.) The three home loan payments were recorded as shareholder distributions. (*Id.*) In subsequent journal entries, many of the personal expenses were reclassified as shareholder distributions. (DE # 40-3 at 3.) Paganelli was the sole shareholder. (DE # 40-4 at 17-18.)

Lovelace argues that these personal payments using Company funds breached the representations and warranties Paganelli made in the Agreement in numerous ways. First, Section 3.3(B)(1) of the Agreement promised that the financial statements attached to the Agreement "conformed to the Corporation's books and records prepared in the ordinary course of business." (DE # 40-1 at 8.) Lovelace's accounting expert, Kathleen Kolodziej, CPA, opined that the financial statements provided by Paganelli in connection with the Agreement did not conform to the books and records prepared in the ordinary course of business. (DE # 40-3 at 4.)

Second, Section 3.3(B)(2) of the Agreement promised that the financial statements "show Corporation's total expenses during the periods covered" and Section 3.3(B)(3) promised that the financial statements "present fairly Corporation's financial position and the results of operations for the periods those financial statements cover[.]" (DE # 40-1 at 8.) Kolodziej opined that the financial statements provided by Paganelli in connection with the Agreement did not fairly show the financial condition of the Company. (DE # 40-3 at 4.) She noted that the September 2009 financial statements included costs in excess of billings and billings in excess of costs. (*Id.*) Jobs with estimated costs to complete were noted as being 100% complete, which significantly impacted the revenue recorded. (*Id.*) For example, one job was noted as 100% complete, but based on the costs to complete the job, it was only 66% complete, which resulted in an additional recorded revenue of approximately $118,000. (*Id.* at 5.) She opined that the

3

Company's books and records did not accurately record the Company's transactions and did not use sound business practices. (*Id.*)

Section 3.3(B)(4) of the Agreement promised that the financial statements were "prepared in accordance with U.S. generally accepted accounting princials (sic) consistently applied" except for "any deviations previously disclosed, in writing, to Buyer" and "the interim financial statements . . . which lack footnote disclosure and may change because of normal, immaterial year-end audit adjustments." (DE # 40-1 at 8.) First, Kolodziej found that the financial statements for 2007 and 2008 did not conform to generally accepted accounting principles. (DE # 40-3 at 2.) Second, Kolodziej found that the 2008 year end financial statements created in May 2009 changed materially from the numbers included in the Business Valuation Report created in February 2009, and revealed a net income decrease of over $600,000. (*Id.* at 2, 5.) The Business Valuation Report identified a 2008 net income of $1,362,175 and shareholder equity of $1,843,990. (*Id.* at 5.) However, the May 2009 financial statements report a net income for 2008 of $725,662 and shareholder equity of $1,207,477. (*Id.*) Kolodziej determined that the financial information used to create the Business Valuation Report was substantially overstated, and that these year end adjustments were not immaterial. (*Id.* at 2, 5.)

Lovelace also argues that Paganelli violated Section 3.5 of the Agreement, which promised that the books and records of the Company "accurately record all transactions of Corporation during the periods they cover and have been consistently maintained

4

using sound business practices," and Section 3.13 of the Agreement, which promised that none of Paganelli's representations and warranties are false in any material respect. (DE # 40-1 at 9, 12.) Kolodziej opined that: the financial statements provided by Paganelli in connection with the contract were materially false; the Company's books and records did not accurately record the Company's transactions; and the Company did not use sound business practices. (DE # 40-3 at 4.)

Lovelace argues that Paganelli violated Section 3.7 of the Agreement, which promised that since December 31, 2008, the Company has operated "in the ordinary course and consistent with past practice," and has not:

> (A) experienced any change that could have a material adverse effect on Corporation's condition, business operations, assets or prospects;
>
> (B) entered into any transaction or incurred any liability or obligation except in the ordinary course of business;
>
> (C) incurred any extraordinary loss;
>
> (D) transferred any interest in its assets, except for selling inventory in the ordinary course of business;
>
> (E) incurred any indebtedness, except for trade creditor indebtedness incurred in the ordinary course of business;
>
> (F) declared or paid any dividend or distribution to any Shareholder, other than those issued or declared during the ordinary course of business;
>
> * * *
>
> (I) increased any compensation or benefits to any officer, director, shareholder or employee, except for increases in its employee's annual salaries made in the ordinary course of business consistent with past practices;

>   (J) established any new pension plan, welfare plan, or other employee benefit plan, modified any current plan, or incurred under any current plan any obligation or liability materially different from those incurred during similar periods in prior years;
>
>   * * *
>
>   (N) materially changed how it conducts business or the accounting principals (sic) it employs[.]

(DE # 40-1 at 9-10.)

According to Lovelace, Paganelli violated the provisions of Section 3.7 in two ways. First, Kolodziej found that the Company took on debt to fund shareholder distributions in the year of sale. (DE # 40-3 at 5.) Kolodziej found that shareholder distributions totaled $488,557 in 2009, totaled $152,903 in 2008, and totaled $0 in 2007. (*Id.*) In 2009, the Company borrowed $770,000, whereas at the end of 2008, the line of credit balance was $0. (*Id.*) Kolodziej determined that, based on the excess distributions in 2009 compared to earlier years, and the extra borrowing in 2009 compared to earlier years, the Company had not been operated in the ordinary course of business and did not operate consistent with past practices in 2009. (*Id.*) Moreover, Kolodziej opined that the Company incurred debt other than in the ordinary course of business, and the Company materially changed how it conducted business in 2009. (*Id.*)

Second, Lovelace argues that Paganelli violated the promises in Section 3.6 and 3.7 in the Agreement that the Company did not have any liability or obligation not already disclosed, and that since December 31, 2008, the Company has not incurred any obligation or liability materially different from those incurred during similar periods in

prior years. In 2012, the Company settled a lawsuit that the Company's labor union filed against the Company for alleged underfunding of contract and pension liabilities from July 2005 through March 2010, totaling $289,766.34. (DE # 40-2 at 3, 81-82.) The Company also incurred attorney's fees related to this litigation in the amount of $129,206.39. (*Id.*) These union liabilities were not disclosed or reserved for in the Agreement. (DE # 40-1 at 5.)

Lovelace states that if he had known in 2009 about Paganelli's removal of assets from the Company, the addition of significant debt to the Company, and the outstanding union liabilities, he either would not have agreed to the purchase or would have demanded a significant reduction in the purchase price. (*Id.* at 4.) He argues that Paganelli's removal of nearly half a million dollars in working capital meant that he had to incur additional debt to replace the working capital. (*Id.*) He states that incurring this debt was made more difficult in light of the fact that the Company incurred $770,000 of debt in 2009 before the sale. (*Id.*)

C. *Procedural History*

Several years after the Agreement was signed, the parties began disputing how much was still owed under the Agreement, and Lovelace stopped paying Paganelli's salary before he was authorized to do so under the Agreement. (DE # 40-4 at 119, 129, 131.) Paganelli maintains that, in addition to the unpaid salary, Lovelace still owes Paganelli $2.1 million under the terms of the Agreement. (*Id.* at 130.)

7

In December 2017, Paganelli filed this suit in the Lake County Superior Court. (DE # 2.) Lovelace removed the case to this court on the basis of diversity jurisdiction. (DE # 1.) Paganelli's amended complaint alleges three counts: breach of contract, complaint for accounting, and breach of promissory note. (DE # 3.) Lovelace filed a counterclaim alleging two counts: breach of contract, and fraud. (DE # 4.)

Lovelace now moves for summary judgment on Paganelli's claims and on the liability question of his breach of contract counterclaim. (DE # 38.) Lovelace's motion for summary judgment is fully briefed and is ripe for ruling.[1]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (internal citation omitted).

---

[1] While Lovelace's motion claims that granting his motion would leave only the question of damages pending, Lovelace's motion does not move for summary judgment on Count II of his counterclaim, for fraud. Accordingly, that claim remains outstanding.

"[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. "Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Id.*; *see also Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992).

If this initial burden is met, the non-moving party must thereafter identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*,

9

634 F.3d 895, 899 (7th Cir. 2011). The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

### III.   ANALYSIS

#### A.   *Lovelace Affidavit*

As a preliminary matter, Paganelli argues that this court should strike Lovelace's affidavit as a "sham affidavit." (DE # 44 at 7.) This request is denied, for two reasons. First, pursuant to Local Rule 56-1(e), "[a]ny dispute regarding the admissibility of evidence should be addressed in a separate motion in accordance with L.R. 7-1." Paganelli failed to file a separate motion addressing the issue.

Second, while Paganelli argues that Lovelace's affidavit contradicts his deposition testimony, he does not identify a single contradiction or other support for his argument. Instead, Paganelli argues, without legal citation, that Lovelace was required to establish "why he needed to proffer an affidavit as a supplement to his deposition[.]" (DE # 44 at 8.) "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (internal citation and quotation marks omitted); *see also Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir.), *opinion amended on denial of reh'g*, 387 F. App'x 629 (7th Cir. 2010) ("It is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by

10

counsel." (cleaned up)). Accordingly, Paganelli's request that this court strike Lovelace's affidavit is denied.

    B.    *Breach of Contract*

Both parties claim that the other is liable for breaching the Agreement. "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (internal citation and quotation marks omitted).

Lovelace argues that he is not liable for breach of contract pursuant to the "first material breach" doctrine in Indiana law. "It is well established that '[w]hen one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date.' " *A House Mechanics, Inc. v. Massey*, 124 N.E.3d 1257, 1262 (Ind. Ct. App. 2019) (quoting *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011)). Whether a party has materially breached depends on a variety of factors:

> (1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;
>
> (2) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;
>
> (3) The extent to which the party failing to perform has already partly performed or made preparations for performance;
>
> (4) The greater or less hardship on the party failing to perform in terminating the contract;
>
> (5) The willful, negligent or innocent behavior of the party failing to perform; and

11

> (6) The greater or less uncertainty that the party failing to perform will perform the remainder of the contracts.

*Id.* at 1263 (internal citation and quotation marks omitted); *Hussain v. Salin Bank & Tr. Co.*, 143 N.E.3d 322, 331 (Ind. Ct. App.), *transfer denied*, 152 N.E.3d 585 (Ind. 2020).

Here there is no real dispute that Lovelace prematurely ceased performance under the contract. The question before the court is whether Paganelli committed the first material breach. If so, his claims against Lovelace fail as a matter of law.

The question of whether Paganelli committed the first material breach is the central question in both Lovelace's motion for summary judgment on Paganelli's claims, and Lovelace's breach of contract counterclaim. Therefore, the court condenses the discussion, viewing the evidence through the prism of Lovelace's substantive evidentiary burden. *See Anderson*, 477 U.S. at 254. Because Lovelace seeks summary judgment on a claim as to which he will bear the ultimate burden of proof (his breach of contract counterclaim), he must have: laid out the elements of the claim; identified the facts which satisfy those elements; and demonstrated that the record is so one-sided as to rule out the prospect of a finding in favor of Paganelli. *Id.*; *see also Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992).

Lovelace has met this burden. Lovelace set forth evidence that establishes that Paganelli breached the Agreement. The undisputed evidence establishes that Paganelli breached numerous warranties and representations made in the Agreement. For example, Lovelace submitted evidence, in the form of Kolodziej's expert opinion, that

12

by inflating billings on incomplete jobs (and thus significantly inflating the revenue recorded), the financial documents provided by Paganelli did not fairly show the financial position of the Company, did not accurately record the Company's transactions, and did not use sound business practices. Kolodziej also found that the financial information used to create the Business Valuation Report was substantially, and materially, overstated, revealing a disparity of more than $600,000 in the net income reported for 2008. This was contrary to Paganelli's promise to accurately record all transactions, and was not merely an " immaterial year-end audit adjustment[][.]"

The undisputed evidence further establishes that Paganelli breached his promise that, since December 31, 2008, the Company had operated in the ordinary course and consistent with past practice, and had not transferred any interests in its assets, incurred any indebtedness, paid any shareholder, or increased compensation to any shareholder, except in the ordinary course and consistent with past practice. The undisputed evidence demonstrates that, during the course of 2009, the Company took on debt that was outside the ordinary course, in order to fund payments to, or for the personal benefit of, Paganelli, and that these payments were both outside the ordinary course of business and were not consistent with past practice.

Moreover, Paganelli breached the warranty in the Agreement that the Company did not have any outstanding liabilities or obligations. In 2012, the Company settled a claim for outstanding pension liabilities from the pre-sale period. These liabilities had not been disclosed in the Agreement.

Lovelace has set forth evidence that establishes that these breaches were material. The undisputed evidence demonstrates that, by stripping the Company of assets, incurring debt to fund personal expenses and payments, and representing these payments as Company expenses, Paganelli deprived Lovelace of a substantial benefit he reasonably anticipated under the Agreement. The evidence further demonstrates that: Paganelli's actions were willful; that Lovelace can be adequately compensated by damages in his favor; and that the likelihood of cure by Paganelli is very small.

Thus, Lovelace satisfied his burden of establishing that the undisputed evidence, taken in the light most favorable to Paganelli, is so one-sided as to rule out a finding in favor of Paganelli, on the question of Paganelli's first material breach of the Agreement.

For his part, Paganelli failed to point to any evidence that would create a question of fact on the question of his first material breach. Paganelli's primary argument in opposing summary judgment is that Lovelace failed to exercise due diligence prior to entering the Agreement. (DE # 44 at 1.) Paganelli argues that Lovelace failed to produce evidence that Paganelli made misrepresentations in the financial records for the Company, and that his use of Company funds for personal expenses was there in the books for Lovelace to find, if only Lovelace had looked. (*Id.* at 9.)

Paganelli does not cite any authority for his position that a lack of due diligence can serve as a defense to a breach of contract/breach of warranty claim such as the one in this case. The Indiana Supreme Court has long held that there is no duty to investigate where there is an express warranty. "A warranty is a promise relating to

14

past or existing fact that incorporates a commitment by the promisor that he will be responsible if the facts are not as manifested. As Judge Learned Hand noted, a warranty is intended to relieve the promisee of any duty to ascertain the fact for himself." *Berg*, 170 N.E.3d at 230–31 (internal citations and quotation marks omitted); *see also Vaupel v. Lamply*, 181 Ind. 8, 103 N.E. 796, 797 (1914) (no duty to inspect goods subject to express warranty because "the main purpose of an express warranty is to render inspection unnecessary").

Paganelli's argument that he cannot be liable for breaching the contract because Lovelace could have discovered the personal expenses, had he looked, would render the Agreement's warranties meaningless. "A reasonable person wouldn't find that the parties added the warranty provision without intending it to have any effect, and our case law requires that we make every effort to avoid a construction of contractual language that renders any words, phrases, or terms ineffective or meaningless." *Berg*, 170 N.E.3d at 231 (internal citation and quotation marks omitted).

Furthermore, while Paganelli argues that there were no misrepresentations in the financial records, he does not cite any evidence that could create a question of fact on the issue.

The undisputed evidence demonstrates that Paganelli committed the first material breach of the Agreement. Accordingly, Lovelace is entitled to judgment as a matter of law on Paganelli's claims, as well as on his own breach of contract counterclaim.

IV. **CONCLUSION**

Defendant's motion for partial summary judgment (DE # 38) is **GRANTED.** This case is **REFERRED** to Magistrate Judge Andrew P. Rodovich for settlement proceedings; should those proceedings be fruitless, this case will be set for trial under separate order.

**SO ORDERED.**

Date: September 28, 2021

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT